## JOHN KELLER v. D. G. SWARTZ.

APPEAL BY DEFENDANT FROM THE COURT OF COMMON PLEAS OF LANCASTER COUNTY.

Argued May 20, 1890—Decided October 6, 1890.
[To be reported.]

1. A decree, upon a bill for a settlement of partnership accounts, adjudicating the fact of partnership, and ordering that the defendant render

Statement of Facts.

an account before a master of all his partnership transactions with the plaintiff, is interlocutory only, and no appeal will lie therefrom until a final decree upon the accounting.

2. An agreement by two persons to contribute equally to a common fund to be used by a third person in speculating in stocks for their joint benefit, does not make them technical partners inter sese, where there was no arrangement between them that they should assume that relation : Per Mr. Justice GREEN.

3. If two persons, joined in a stock speculation, agree, with no unsettled accounts between them, that one may sell his half of the stock at his discretion, and in pursuance thereof the latter proceeds to sell his share, while the other holds his for a rise, neither is liable to an account to the other thereafter as in a partnership.

4. To render such an agreement effective, it is not essential that stock held by the broker of the parties, as security for advances made for its purchase, be at once withdrawn and divided; nor will the fact, that the broker continues to keep on his books an account against the parties as partners, be evidence that the association continues as between themselves.

Before PAXSON, C. J., STERRETT, GREEN, CLARK and Mc-COLLUM, JJ.

No. 297 January Term 1890, Sup. Ct.; court below, No. 2 Eq. D., p. 225, C. P.

On June 19, 1882, John Keller filed a bill in equity against David G. Swartz, averring the existence of a partnership between the plaintiff and the defendant for the buying and selling of corporate stocks, and praying for an account, etc. The defendant having answered, denying the partnership, the cause was referred by the court to *Mr. Amos Slaymaker* as master, who found, in substance, the following facts :

In the early part of June, 1876, the plaintiff and defendant agreed to buy jointly, as a speculation, 3000 shares of the stock of the Hestonville & Mantua Railroad Company, and at different times during that month they made purchases of that stock aggregating 3000 shares, through Reed, McGrann & Co., a banking firm in Lancaster. The purchases were made in the name of Reed, McGrann & Co., who advanced the purchase money and received and held the certificates of stock, further protecting themselves against loss by taking from the plaintiff and the defendant, in about the same proportion as to value, deposits of securities such as appeared to constitute a sufficient

margin. About the time the first purchase was made, they opened on their books an account headed " Swartz & Keller, in account with Reed, McGrann & Co." The purchases were made by the banking firm in pursuance of written orders signed " Keller & Swartz, per D. G. Swartz," or " D. G. Swartz, for Keller & Swartz."

On July 27, 1876, in accordance with an arrangement between them, Swartz sold " short, " through his brokers in Philadelphia, 1000 shares of Hestonville stock, and Keller sold in the same way, through his brokers, 500 shares. The 1500 shares thus sold were afterwards delivered by Reed, McGrann & Co., who received the proceeds of the sales, entering their aggregate sum as a single item or credit in the account above mentioned. On the evening of the same day, July 27th, Keller and Swartz rather reluctantly agreed, at the solicitation of Bond, Moxey & Co., to buy 2000 additional shares, to help Bond, Moxey & Co. corner the market, upon receiving from them an indemnity against loss in the transaction. The 2000 shares were purchased the next day through Reed, McGrann & Co., and in their name. On July 29th, the failure of Bond, Moxey & Co., was announced, and the price of Hestonville stock at once dropped from $41 to $29 per share.

Down to July 31, 1876, both the plaintiff and the defendant treated their speculation in this stock as a joint enterprise. Subsequent to that time, as it began to be apparent that loss rather than gain was likely to result from their adventure, differences of opinion arose between them as to the course to be pursued in regard to the 3500 shares yet remaining in the hands of Reed, McGrann & Co., Swartz being anxious to sell as speedily as possible and Keller being inclined to hold on to the stock in the hope of higher prices for it in the future.

" On this subject they had several conferences, as to the conversations at which, their statements differ widely and materially ; " but the master was persuaded " that the result of the conferences was an understanding that each should control and dispose of, at his discretion, the one half of the Hestonville stock yet in the hands of Reed, McGrann & Co. This understanding, however, was not followed by any attempt, on the part of either the plaintiff or the defendant, to procure for himself the actual separate possession or control of the evidences

of ownership of any portion of this stock, nor by any change in their account with Reed, McGrann & Co., that account remaining at the close of the business precisely as it had been opened, the account of that firm with Swartz & Keller jointly; and the proceeds of all subsequent sales of this stock, whether on orders of Swartz individually, or Keller individually, or either in the name of both, were alike carried into the joint accounts as credits thereupon."

The entire 3500 shares of stock were afterwards sold by Reed, McGrann & Co., 1750 shares thereof being sold upon orders signed by Swartz with his own name only, and the remaining 1750 shares upon orders given by Keller. Two of the latter orders were produced. One, dated November 11, 1876, was signed by Keller in his own name, and the other, dated January 18, 1879, was signed by him in the name of Keller & Swartz. In June, 1878, Swartz removed to Chicago. Immediately before doing so, he gave Reed, McGrann & Co. a note, in his individual capacity, for $3,000, which seems to have been estimated by that firm, as well as by himself, to be the amount of his proportion of the unsatisfied liability of Swartz and Keller on their joint account. The note was afterwards paid in full. After the removal of Swartz, Keller gave orders for the sale of the remaining stock, the proceeds of such sales being uniformly credited to the joint account, and he furnished from his individual resources the amount necessary, in addition to those proceeds, to meet the liability of Swartz and Keller to Reed, McGrann & Co. The testimony in reference to the understanding between Keller and Swartz relative to the sale of the stock, and the facts connected therewith, is stated in the opinion of the Supreme Court, infra.

The master, after finding the facts substantially as they are given above, stated the questions for consideration and answer by him as follows :

1. Did the plaintiff and defendant, in their dealings in Hestonville & Mantua R. Co. stock, as above mentioned, ever assume, as to each other, the duties and liabilities incident to membership in a commercial partnership? If this question be answered in the negative, the plaintiff's bill must be dismissed; but if, on the other hand, it is answered affirmatively, there are to be determined the further questions following, viz. :

Master's Report.

2. Whether, if these parties did commence and for some time continue their dealings in Hestonville R. Co. stock, as partners, they did not, afterwards and previously to the commencement of this suit, by common consent entirely cease to hold, as to each other, any such relation, each becoming in severalty the absolute owner of the one half of the stock then in the hands of Reed, McGrann & Co., and as to that half being thenceforth freed from any responsibility or liability to his former associate ?

3. Whether, if both the preceding questions be answered adversely to the contention on behalf of the defendant, the dealings in Hestonville R. Co. stock, to which they have reference, were not merely gambling transactions upon which neither of the parties concerned therein can found claims or rights that may be recognized and enforced in any court of Pennsylvania ?

—After citing 1 Collyer on Part., 7, §§ 18, 19, and Welsh v. Speakman, 8 W. & S. 257, the master proceeded:

That the plaintiff and defendant, with reference to the transactions in question, ever in express terms agreed to become partners, has not been proved ; but, from the acts, declarations, and general conduct of both in the matter, the conclusion of the master is that the first question is to be answered affirmatively.

As to the second question : Doubtless partners may, as between themselves, at any time dissolve their partnership, convert their joint ownership of the property into several ownerships by each of them of a specific portion of it, and mutually release each other from any liability in regard to such specific portions ; but communion of loss, as well as of profit, being an essential feature of the partnership relation, no one who has entered into that relation can be relieved from liability to contribute to losses occurring in the business of the partnership, whether before or after its dissolution, and though there may have been a settlement and distribution of the assets between the partners, otherwise than by an express and distinct agreement to that effect between the other member or members of the firm and himself ; or, it may be added, unless the loss has been caused by the fraud or gross negligence of the partner by whom contribution is sought.

Master's Report.

—Citing and quoting from Kelly v. Kauffman, 18 Pa. 351; Knox v. Sprecher, 68 Pa. 415, the master then continued .

In the case in hand, there does not appear to have been even a settlement of accounts between Swartz and Keller, or an actual distribution of assets, such as occurred between the partners in the cases last cited; and certainly there is no proof, either of an express agreement between Swartz and Keller, that both or either of them should be released from liability to contribute to losses, or that Keller, as to the portion of the business conducted by him, acted otherwise than with good faith and reasonable diligence.    The second question is therefore answered negatively.

As to the third question : That the dealings of these parties in Hestonville & Mantua R. Co. stock were entirely speculative in character, there can be no doubt; but were they also mere gaming transactions, by means of which neither of the parties concerned therein could acquire rights that would be recognized by the courts of this state as affording a valid ground for proceedings at law or in equity?

—After citing Kirkpatrick v. Bonsall, 72 Pa. 155; Maxton v. Gheen, 75 Pa. 166; Smith v. Bouvier, 70 Pa. 325; North v. Phillips, 89 Pa. 250; Fareira v. Gabell, 89 Pa. 89; Dickson v. Thomas, 97 Pa. 278, this third question was answered as follows :

In the case before the master, it having been found that these parties did in fact, by the agency and aid of Reed, McGrann & Co., buy 5000 shares of the stock of the Hestonville etc. R. Co., the certificates for which were actually delivered to and held by Reed, McGrann & Co., subject to the disposal of these parties as owners thereof, and those shares having been in fact subsequently sold and delivered by Reed, McGrann & Co., in pursuance of orders to that effect given by these parties, it is manifest that the dealings in this stock, so far as these parties were concerned, were in the nature of actual bona fide purchases, by means of which they were intended to obtain, and did obtain, its absolute ownership and control, subject only to the right of Reed, McGrann & Co. to be repaid the money advanced by them for its purchase.    It seems therefore, under the decisions cited above, to be quite clear that these dealings in Hestonville R. Co. stock were not mere gambling transac-

tions, upon which could be founded no rights which can be recognized as valid by the courts of Pennsylvania, and that the third question can be answered only in the negative.

—The master thereupon recommended a decree that the defendant " render an account, before a master to be appointed by the court, of all the joint or partnership transactions between him and the plaintiff since the commencement of their partnership. "

Exceptions to the master's report, after argument, were overruled by the court, PATTERSON, J., and the decree recommended by the master was entered. Thereupon, the defendant entered an appeal to the Supreme Court, which appeal was afterwards quashed, upon the ground that the decree of the court below was interlocutory only ; and upon the return of the record to the court below *Mr. David McMullen* was by consent of counsel appointed master to take an account between the parties, Mr. Slaymaker declining to act in that capacity.

From the accounts of the parties presented to the second master, and the testimony taken by him, it appeared that Swartz, between August 31, 1876, and January 30, 1877, sold 1700 shares of the stock for $37,525, and on January 18, 1879, sold 50 shares for $550, the average price realized by him being $21.75 per share ; and that the other 1750 shares were sold by Keller at different times, 1000 of them being sold between February 5 and March 4, 1878, and 150 on January 18, 1879, the average price on his sales being $8.71 per share. Stating an account between the parties, the master found that the total loss on the joint speculation was $79,449.46, and that there was due from Swartz to Keller, on account of Swartz's half of that loss, a balance of $14,783.42, and recommended a decree in favor of the plaintiff for that sum, together with interest from October 8, 1881, the date when the last payment was made by Keller to Reed, McGrann & Co. and their account with Swartz & Keller was closed, making an aggregate of $21,362.03.

Exceptions to the report of the second master were overruled in the following opinion, PATTERSON, J.:

The exceptions, or many of them, challenge the accuracy of the master, upon questions of fact, as well as his application of the law in his determination of questions of evidence ; and I

must say that my mind inclined to the belief that the master did commit error, and that this whole transaction between the plaintiff and defendant was a gambling transaction, and should have been so held in law. But, it appearing that the evidence submitted fully established, to the satisfaction of the master, the material averments of the bill, and disposed of the allegations of the answers, so far as it seemed to him necessary to consider the same, in connection with the case under discussion, we must forbear setting aside the findings.

We therefore now dismiss all the exceptions, and confirm the report of the master.

—A formal decree for the payment of the amount reported by the master to be due from the defendant to the plaintiff, with the costs of suit, having been entered, the defendant took this appeal specifying that the court erred, inter alia :

3. In not dismissing the plaintiff's bill.

4. In making the decree for the payment of $21,362.03, and costs of suit.

*Mr. D. G. Eshleman* and *Mr. A. Herr Smith*, for the appellant :

1. A partnership inter sese results from the intention of both parties, and that of one party cannot create it: Collyer on Part., 6th ed., 7, n. 9 ; Phillips v. Phillips, 49 Ill. 437. Stronger proof is required to make it out than is requisite to show a partnership as to third persons : Chisholm v. Cowles, 42 Ala. 179 ; Fox's Dig. of Part., 185, 187. And, though they may be partners as to third persons, the parties will not be such between themselves if they agree that a partnership shall not exist : Gill v. Kuhn, 6 S. & R. 332, 337 ; Hazzard v. Hazzard, 1 Story C. C. 371 ; Jordan v. Wilkins, 3 Wash. C. C. 110, 116. If the relation in this case was that of partnership in the beginning, it was dissolved by agreement of the parties in August, 1876. Such a change of relation may be made : Brown v. Black, 96 Pa. 482 ; and the master has found that agreement.

2. The master erred, however, in holding that agreement ineffective, because not followed by any attempt to procure the actual, separate possession or control of any part of the stock certificates, nor by any change in the account kept by Reed, McGrann & Co. But no further action was necessary. Each

party held, without dispute, one half the stock, and there were then no accounts to be settled between them. However, the separate sales on his individual account, made by Swartz, were not only an attempt to procure, but were an actual procuring of the separate possession and control of his portion of the stock. Keller and Swartz both recognized the agreement as binding. There is no evidence that they knew how the account was kept by Reed, McGrann & Co., and neither can be prejudiced by the form of the account. Moreover, Reed, McGrann & Co., made separate settlements and recognized the separate interests of Keller and Swartz, under their agreement of August, 1876. But the master reports, relying on Kelly v. Kauffman, 18 Pa. 351, and Knox v. Sprecher, 68 Pa. 415, that, notwithstanding a dissolution, there must be a settlement of the losses.

3. If Keller could bring himself within those cases, he would have to show that he acted in good faith and with reasonable diligence in disposing of his stock, and his conduct in holding it on speculation, against the express wish of Swartz, until it fell to $8 per share, and then selling it without consulting Swartz, does not answer this requirement. The excess of his loss over that on the 1750 shares sold by Swartz resulted from his own breach of faith toward his alleged partner, and there is no equity in his claim for contribution: Jeffers v. Gill, 91 Pa. 290; Wethrill's App., 3 Gr. 281; Lefever v. Underwood, 41 Pa. 505; 1 Lindley on Partnership, 302*, 303*; Bank v. Reese, 26 Pa. 143; Reitenbaugh v. Ludwick, 31 Pa. 132; Musgrave v. Beckendorff, 53 Pa. 310. And interest should not have been allowed; its allowance or refusal, in the settlement of partnership accounts, depends upon the circumstances of each particular case: Gyger's App., 62 Pa. 73; Rehill v. McTague, 114 Pa. 82.

4. If there ever was a partnership between the parties, it was formed for the purpose of gambling in stocks, and therefore was illegal and void. Partnership rights can be enforced only when the purpose of the partnership is the carrying on of a legal business: 1 Collyer on Part., 6th ed., 7; Wharton's Law Lexicon, 749; 1 Wharton on Contracts, § 349; Knowles v. Haughton, 11 Ves. 168; Ewing v. Osbaldison, 2 M. & Cr. 53, 87; Sykes v. Beadon, L. R. 11 Ch. Div. 170; Durham v. Pres-

Arguments.

ley, 120 Mass. 283; Patterson's App., 13 W. N. 154; Watson v. Murray, 8 C. E. Green 257; Watson v. Fletcher, 7 Gratt. 1. Transactions in stock by way of margins, without intent to deliver, are mere wagers: Kirkpatrick v. Bonsall, 72 Pa. 155; Maxton v. Gheen, 75 Pa. 168; North v. Phillips, 89 Pa. 256; Dickson v. Thomas, 97 Pa. 278; Patterson's App., 13 W. N. 154. An attempt to corner the market is an indictable conspiracy: Morris R. Coal Co. v. Coal Co., 68 Pa. 173. The 2000 shares bought for that purpose, being indistinguishable, taint the whole lot, and render the whole business illegal: Frazier v. Thompson, 2 W. & S. 235; Morris R. Coal Co. v. Coal Co., 68 Pa. 173.

*Mr. George M. Kline* and *Mr. H. M. North,* for the appellee:

1. The testimony shows that the stock was bought and held for the joint risk of Swartz and Keller as to profit and loss, and the master could not have answered the first of the questions stated by him otherwise than as he did. As to the second question, his findings are clearly right. We do not dispute the power to dissolve the partnership at any time by common consent, but after such dissolution the mutual responsibilities of the parties, occurring in the business, remain precisely as if the dissolution had not taken place. Nothing short of an agreement mutually releasing each other, will put an end to such liability: Kelly v. Kauffman, 18 Pa. 351; Knox v. Sprecher, 68 Pa. 415.

2. Admitting the correctness of the defendant's allegations as to the interviews in August, 1876, they show nothing more than an arrangement that each party should dispose of one half the stock at his discretion, leaving him to account to the other for the faithful exercise of that discretion in their final settlement. There being no special agreement to control their rights, either of the parties may compel a settlement through equity: Parsons on Part., 386. And, while these stock dealings were speculative in their character, they were not gambling transactions. The certificates were actually delivered to Reed, McGrann & Co., and held by them at the disposal of the owners, subject only to the re-payment of the advances made for their purchase.

3. Conceding the rule as to interest, laid down in Gyger's App., 62 Pa. 79, there is a point of time when interest will begin against a partner who is in default and owes his copartner

### Opinion of the Court.

on settlement. The period of dissolution is the proper time to make a rest and adjust the balance of the partnership account, and the partner against whom the balance is found is chargeable with interest thereon from that time : Collyer on Part., § 335 and n. 1; Stoughton v. Lynch, 2 Johns. Ch. 209. In this case, the master and the court properly treated October 8, 1881, when the whole account with Reed, McGrann & Co. was adjusted, as the time for adjusting the partnership account and commencing to charge interest on the balance.

OPINION, MR. JUSTICE GREEN :

We do not regard it as clearly established by the testimony that the relationship between the parties as to the subject-matter of their transactions was a technical partnership. There was certainly a joint interest, as two persons may readily have in a common property, real or personal. As the business to be transacted was to be done by third persons, it was not the ordinary case of joint contribution to a common fund representing capital, in the management of which the two contributors were to participate directly, but rather the case of an agreement by each one to furnish an equal amount of money, or money's worth, to the third persons who were really to conduct the business contemplated. The alleged relation of partnership was denied by the answer, and also by the defendant in his testimony, and was rather feebly expressed by the plaintiff in his testimony, and that, rather as an inference from the joint character of the enterprise, than as a fact distinctly agreed upon. But it is unnecessary to enlarge upon this subject, as the decision of the case does not depend upon it.

There did come a time, after all the purchases of stock had been made, when a very momentous question arose, which required prompt decision. In the last days of July, the parties consented, though reluctantly, to purchase 2000 shares of Hestonville stock, at the instance and urgent request of Bond, Moxey & Co., in order to help them corner the market. For this stock they paid $41 a share. The very next day, Bond, Moxey & Co. failed, and the guaranty they had given to Swartz and Keller, to save them from loss, became worthless. The stock immediately fell to $29, and was somewhat lower than that continuously during the month following. On the

24th of August, the parties were together, and, if the testimony of the defendant is to be believed, a conversation of the utmost consequence to the parties and to this litigation took place between them.

This is the defendant's version of it: "On the 24th of August, 1876, Keller called at my house in Lancaster, in the evening. We discussed the market. I said the stock was weak; I could see it declining every day, it was too much like cutting off a dog's tail, inch by inch. Keller said, ' Well, you may sell your stock on your own account, and I will hold mine yet for a rise.' He made similar remarks several times that evening, and my wife was present in the room when the remarks were made. On the following Monday, August 28, 1876, he was again at my house, in the evening. I said to him, 'I want to sell my stock.' He said, ' Well, you may sell yours if you choose, but I will not sell yet. It will rise again.' I said, ' Yes; it may rise again some time, but it now looks more like declining.' He said, ' Well, I have nothing to do with your stock. You sell yours, and I will hold mine, and see which of us will do the best.' Mrs. Swartz was present. I considered it perfectly well understood between us, from what he had said, that he had nothing to do with my stock, nor I with his. I then commenced to sell stock. On August 31st, 1876, I sold 200 shares at $24; on September 5th, 1876, I sold 100 shares, at $25 per share; and on September 8th, 100 shares, at $25.50 per share. I made these sales by giving my individual order to Reed, McGrann & Co., and particularly called their attention to the fact that it was my individual order; that I was selling my own stock, and that it had nothing to do with Keller's stock. After selling this 400 shares, I met Mr. Keller in North Duke street, near the railroad bridge, towards evening, and told him I had sold 400 shares of stock. He said, ' Well you may sell all of yours for what I care, but I won't sell yet,' and gave some reasons why he thought it would rise again, something he had heard in Philadelphia; I think it was about the management of the company. I then, between that time and the 27th January, 1877, at different times, sold all my stock except fifty shares. It was all sold by my individual order to Reed, McGrann & Co., and, every time I gave an order, I called their attention to the fact that I was selling my stock on my account,

and it had nothing to do with Keller's stock." The witness then testified to some conversations with Mr. Reed of the firm of Reed, McGrann & Co. He described the full extent of his share of the purchases, the aggregate amount thereof, the manner in which he made payment for them, and a full settlement he had with Reed, McGrann & Co., for his whole share of the business, which resulted in his paying them $6,777.93, made up of various cash payments, and a note for $3,000, on June 25, 1878, in full, which note he subsequently paid.

Mrs. Swartz, the defendant's wife, was also examined, and testified as follows on this subject: "In my husband's office, in Lancaster, about three weeks after the 1st of August, six years ago,—that is, six years ago last August,—Mr. Swartz commenced to talk to Mr. Keller about Hestonville. Mr. Swartz said, 'I am going to sell,' and Mr. Keller said, 'You can do with yours what you please, but I won't sell mine.' Then he went out of the door; with his hand on the door-knob, he said, 'You can just do with yours as you please,' and he laughed when he said it. About four or five days after that, about the same time, (supper time,) he was either coming from or going to his home, he told Mr. Swartz about the same thing, except that he said he was going to keep his for a rise; and that is all I remember."

The learned master, Mr. Slaymaker, makes the following finding upon this part of the case : "Making all due allowance for the fact that this witness is the wife of the defendant, and also for the improbability of her being able to detail with absolute verbal accuracy conversations which had occurred more than six years previously, the master is persuaded that her statement is substantially true, and that the result of the conferences between Keller and Swartz was that each should control and dispose of, at his discretion, the one half of the Hestonville stock yet in the hands of Reed, McGrann & Co." He therefore finds in favor of the defendant on this most vital part of the case, but he declines to make any application of his finding, for a reason which he thus states : "This understanding, however, was not followed by any attempt on the part of either the plaintiff or the defendant to procure for himself the actual separate possession or control of the evidences of ownership of any portion of this stock, nor by any change in their account

Opinion of the Court.

with Reed, McGrann & Co., that account remaining at the close of the business precisely as it had been opened, the account of that firm with Swartz & Keller jointly; and the proceeds of all subsequent sales of this stock, whether on orders of Swartz individually or Keller individually, or either in the name of both, were alike carried into the joint account as credits thereupon."

To this method of disposing of this branch of the case, we are entirely unable to agree, and for various reasons. In the first place, it was no part of the agreement between Keller and Swartz that each one might dispose of his one half part of the stock; that the shares of stock themselves should be taken up from Reed, McGrann & Co. That could not have been done without paying for them, and this would have rendered necessary the payment of an immense sum of money, which it may well be neither of them could pay. But it was selling the stock, and not paying for it, that Swartz and his wife testified was to be done, and the master has found that such was their agreement. They were therefore not to separate it and take it up, but each was to be at perfect liberty to sell his one half of the stock as he pleased. In point of fact, Swartz immediately proceeded to sell his stock at his own prices and on his individual orders, and he kept on doing so until within five months he had sold all but fifty shares. During the same time, Keller kept his, and made no sales until February 5, 1878, nearly a year and a half after Swartz began to sell his. In the next place, these parties had nothing to do with the manner in which Reed, McGrann & Co. kept the account with them on their books. They could not have controlled the manner of keeping it if they would. It was not their business, and any attempt on their part to interfere with the book-keeping of Reed, McGrann & Co. would doubtless have been resented. For this reason, it is plain that the fact that no change was made by Reed, McGrann & Co., in their manner of keeping their account of these transactions, affords no inference against Swartz, either as to the integrity of his testimony, or as evidence that he failed to carry out, or abandoned, his purpose of selling his part of the stock as he had arranged with Keller that he might do. The reasons given by the master, therefore, for declining to give effect to the agreement for the sale of the stock by each,

are not sustained by the considerations which he states himself, and when the testimony and the other subsequent facts are taken into account, he is, in our judgment, convicted of plain error in his treatment of the case.

The master takes no notice of the testimony of the defendant, and yet it is precise, very full, distinct, and emphatic to the point that it was absolutely agreed upon between him and Keller that he, Swartz, should be at liberty to sell his stock as he pleased. The conversations in which this agreement was arrived at were specified, together with the times, the place, the circumstances, the words, and all the details of what was said and agreed upon. They amounted to a clear, distinct, and positive agreement that the defendant, Swartz, should be at liberty to sell his part of the stock just as he pleased, and that he, Keller, would not sell his part, but hold it for a rise. Although Keller had ample opportunity to deny the truth of Swartz's testimony, he never did so, and the case was closed without any contradiction of Swartz's statements by Keller. He was, moreover, corroborated by his wife's evidence as to the part of the conversation heard by her. He made a general denial of having ever agreed to divide the stock, or that each should sell his half of it, in reply to one question, after Mrs. Swartz was examined but before the defendant testified, but, after the defendant testified, giving full particulars of the conversations, he never opened his lips. In such circumstances the general denial goes for nothing. It means nothing more, really, than that in his opinion he never made such an agreement. But the important question is, did the conversations testified to by the defendant occur as stated by him? On that subject, the plaintiff says nothing. The case stands, then, with this positive, affirmative, most vital testimony in it, corroborated by defendant's wife, and not one word in contradiction of it from the plaintiff. We know of no reason why this testimony should be disbelieved, but there are the strongest possible reasons for giving it full credence. It was intrinsically probable. There had been a heavy fall in the price of the stock, and a crisis in the speculation confronted the parties with every appearance of a very heavy loss in the near future. The master does find that there were differences of opinion between the parties as to the policy that should be pursued, and that Swartz was anxious to

sell as speedily as possible, and that Keller was inclined to hold on for higher prices. He also finds that they had several conferences, and adds, "as to the conversations at which, their statements differ widely and materially." The writer has read every particle of the testimony of both the parties, and finds that there is no evidence of any conferences or any conversations, in the testimony of the plaintiff, on the subject of dividing or holding or selling the stock as stated by the defendant. The plaintiff simply gave no testimony on that subject, and it is error, therefore, to say that the statements of the parties differ widely and materially in reference to that matter.

But perhaps the most convincing proof in support of the defendant's testimony as to the sale of the stock by each is found in the subsequent facts about which there is no dispute. The defendant immediately proceeded to do precisely what he says the plaintiff agreed he might do ; that is, made sales of his stock rapidly. He swears that all these sales were made on his own individual orders, and no one contradicts him. He also says he notified Reed, McGrann & Co. that these sales were ordered as to his own part of the stock, and that Keller had nothing to do with them, and no one contradicts him. He also says that he made payments, after he was credited with proceeds of sales, until a balance of $6,777.93 resulted against him, as appears by a memorandum in the handwriting of George K. Reed which Swartz produced. That memorandum is in the following words and figures :

Swartz owes on acc.      .      .      .      .      . $ 8,897 40
Inst. to January 1, 1878,      .      .      .      . 1,880 53

$10,777 93
4,000

$ 6,777 93

He testifies: " On the 1st of January, 1878, Geo. K. Reed, in his own handwriting, (Geo. K. Reed was a member of the firm of Reed, McGrann & Co.,) gave me a memorandum, which I here produce, marked ' A. S. December 28th, No. 1.' On this memorandum he figured up that I owed their firm on my stock $6,777.93, which sum I gradually paid them, and the balance on June 25, 1878, was $3,000, for which I gave them

Opinion of the Court.

my note. The note was renewed several times; was at one time reduced to $2,700, and finally paid, June 18, 1879."

In all of this most important testimony the defendant is not in the least degree contradicted by any witness. It shows in the most ample manner that from August 24, 1876, in making sales and in dealing with Swartz, the firm of Reed, McGrann & Co. did in fact treat the sales as made upon his individual account, and finally settled with him by accepting from him a certain sum in cash and a note for the balance of $3,000, and this although there was a large balance open on their books against the account of Swartz & Keller. In the meantime Keller did precisely what Swartz testified he said he would do; that is, held on to his part of the stock, and made no sales thereof until February, 1878. Sales were subsequently made, and the account was kept open until, on October 18, 1881, the balance of the account was $9,835, which John Keller paid by giving his check for $1,835.50, and his note for $8,000.

It is simply impossible to discredit the testimony of the defendant in the face of facts like these. They show with conclusive force that subsequently to August 24, 1876, the sales made on the orders of the defendant were treated by all the parties as sales made for his account, and that on that basis an adjustment was finally made with him by Reed, McGrann & Co. And they show, also, that the remaining sales were regarded by all the parties as made upon account of Keller, and that the account with him was adjusted upon that basis in October, 1881. It is not alleged by Keller that he ever undertook to interfere with the sales by Swartz, or that Swartz ever interfered with the sales by Keller. Yet, if, in point of fact, each continued to be interested in the whole amount of stock held by Reed, McGrann & Co., it is impossible to believe that no active intervention would have been made, no conferences would have taken place between the parties; in short, that nothing whatever would have been done to indicate their joint interest. Each proceeded after August, 1876, in precise accordance with what Swartz testified they had agreed upon at that time, and neither of them proceeded upon the theory of a continuing joint interest. Finally, Keller settled the whole balance of the account with Reed, McGrann & Co., without calling upon Swartz for any contribution. It was not until June, 1882, that Keller filed his bill

VOL. CXXXVII—6

Syllabus.

in this case, nearly six years after the time fixed by Swartz as the date of the separation of their interests, and more than four years after the great bulk of the stocks held by Keller was sold. Such delay in such a matter, and involving such large amounts, is laches, and is only consistent with the theory that the idea of holding Swartz responsible for the loss which was incurred on the sales made by Keller was an after-thought. The integrity of that claim is opposed to the whole force of the direct and positive testimony of the defendant and his wife, which testimony was entirely uncontradicted by the plaintiff or any one else; it is opposed to the actual facts as they subsequently transpired in regard to the dealings of both parties with the stock held by Reed, McGrann & Co.; it is opposed to the actual conduct of both the litigants in making their settlements with their brokers; and it is opposed to the teachings of common sense as to what two parties so situated would have done, if their interests had not been separated but continued joint.

We are of opinion that the claim of the plaintiff is entirely destitute of merit, and for that reason his bill should be dismissed. It is unnecessary to discuss the question whether the transactions as between the plaintiff and defendant were of a gambling character, because the case is disposed of upon other considerations.

> The decree of the court below is reversed, at the cost of the appellee, and the plaintiff's bill is dismissed, with costs.